IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Charter Oak Insurance Co., | : | CIVIL CASE |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| Maglio Fresh Food d/b/a Maglio's | : | |
| Sausage Co., et al., | : | |
| Defendants. | : | NO. 12-3967 |

**MEMORANDUM RE CONCLUSIONS OF LAW AND VERDICT**

Baylson, J.                                                                                          September 9, 2014

## I. Introduction

This complex insurance dispute involves claims between Maglio Fresh Food ("Maglio")

and its insurers, Charter Oak Insurance Company ("Charter Oak"), the primary insurer, and

American Guarantee Liability and Insurance Company ("American Guarantee"), the excess

insurer.[1]

Upon agreement of the parties, this Court first decided the issue of the insurers' duty to

indemnify Maglio for damages resulting from two distinct claims and two adverse jury verdicts

in the underlying action brought by Maglio's competitor, Leonetti's. Those claims and verdicts

are referred to here, and in prior opinions, as the "Maglio brand" claim or verdict and the "Forte

brand" claim or verdict. Each party submitted a Motion for Summary Judgment on this issue.

On October 24, 2013, in a detailed Memorandum, this Court found that neither insurer owed

indemnity to Maglio for either verdict and/or the resulting judgment. Charter Oak Ins. Co. v.

Maglio Fresh Food, 979 F. Supp. 2d 581 (E.D. Pa. 2013).

---

[1] Both insurers are related to other entities, whose names have been used interchangeably throughout this litigation and in both documentary and testimonial evidence. Thus, Charter Oak is occasionally referred to as Travelers and American Guarantee is occasionally referred to as Zurich.

With respect to the Maglio brand claim, this Court concluded that "Maglio ha[d] not pointed to any evidence in the underlying trial record that shows that Maglio disparaged Leonetti's or its products in its sale of Maglio brand stromboli; rather, it merely misrepresented its own product." Id. at 594.  As a result, Maglio could not meet its burden to show that the policies provided coverage for the Maglio brand verdict.

As for the Forte brand claim, this Court found that "Maglio [could not] demonstrate the extent to which the jury awarded damages based on Leonetti's disparagement theory as opposed to any other theory," thus "Maglio [would] not be able to meet its burden at trial to show that the claim falls within the scope of coverage." Id. at 595.

The parties then conducted discovery on Maglio's counterclaims and cross-claims for bad faith.  Following discovery, each party submitted a Motion for Summary Judgment on these claims.  On July 18, 2014, this Court denied those Motions due to the presence of lingering factual disputes and in recognition of the lack of appellate guidance on the relevant issues, which counseled in favor of a full trial record.  Charter Oak Ins. Co. v. Maglio Fresh Food, CIV.A. 12-3967, 2014 WL 3600383 (E.D. Pa. July 18, 2014).[2]

After the denial of the Motions for Summary Judgment on the bad faith issue, Maglio and Charter Oak agreed to a settlement.  The terms of the settlement are not known to the Court.

The Court then held a bench trial, beginning on July 28, 2014, to decide Maglio's claims against American Guarantee.

After three days of testimony, the Court held argument on August 1, 2014, at which time it gave counsel an opportunity to present any closing arguments and asked a series of questions. At the conclusion of argument, this Court issued a series of verbal findings as to the credibility of

---

[2] The Court initially filed a Memorandum and Order on July 14 but issued a revised Memorandum four days later, solely to clarify the language in footnote 4.

various witnesses.  ECF 220, pp. 60-63.One week later, on August 8, 2014, the Court issued written factual findings.  ECF 212.  The legal conclusions below assume familiarity with the verbal and written factual findings, and all of these constitute the Court's compliance with Rule 52(a) of the Federal Rules of Civil Procedure.

On August 29, 2014, both Maglio and American Guarantee submitted Post-Trial Memoranda.  ECF 223-225.  In a letter dated on the same day, counsel for American Guarantee notified this Court of a dispute between the parties as to Maglio's deposition designations of Amy Baker, a representative of Charter Oak.  The Court will overrule the objections to the designations; however, those designations do not affect the Court's disposition.

## II. Contentions of the Parties

### A. Maglio

Maglio's contentions have been summarized in prior opinions.  At the trial, Maglio made two basic contentions.  The first is that American Guarantee breached its obligations and is liable for bad faith because of its denial of coverage.  Based on the Court's verbal and written factual findings and interpretation of the law and the American Guarantee policy, the Court has concluded that Maglio has failed to prove this claim by the applicable burden of proof.

The second contention of Maglio is that American Guarantee breached its obligations and is liable for bad faith due to its refusal to secure an appellate bond for Maglio so that Maglio could appeal the denial of post-trial motions and the adverse verdicts at the two trials.  The Court's prior findings, both verbal and in writing, summarize the evidence on this point.

As noted in those findings, the Court found that Anthony Maglio, the owner of Maglio, was very concerned about the fate of his company, following the jury's determination against Maglio in the first trial.  Following that verdict, Mr. Maglio privately retained Joseph Turchi,

Esquire to represent Maglio's interest on insurance coverage issue, apart from, and in addition to, Maglio's trial representation being provided by Edward Kelbon, Esquire.

The key period under the facts starts after the second verdict and reaches its most crucial point when Judge Bernstein denied Maglio's post-trial motions.  Following this denial, Maglio's options were to file an appeal of the judgment, to allow execution on the judgment (which would have put Maglio out of business), or to enter a settlement agreement with Leonetti.

Maglio had made clear that it did not want to file for bankruptcy.  Rather, Maglio wanted to appeal, but the Pennsylvania Rules of Civil Procedure (similar to the federal rules and that of virtually all other jurisdictions), would have required a supersedeas bond to be posted in at least the amount of the adverse judgment, or $3.16 million, in order for execution to be stayed pending the appeal.  Mr. Turchi's own investigation revealed that Maglio's poor financial condition prevented it from obtaining funding for a bond from a surety company.  Mr. Turchi thus began a series of negotiations designed to persuade both Charter Oak and Maglio to post an appellate bond to enable Maglio to continue its defense on appeal.

Mr. Turchi acted reasonably at the time, particularly given Mr. Maglio's refusal to file for bankruptcy.  When Turchi's efforts to reach an accommodation with American Guarantee were unsuccessful, Turchi then advised Maglio to reach the best arrangement possible with Leonetti's, the plaintiff in the claims against Maglio, which resulted in the settlement agreement.[3]

Maglio argues that American Guarantee had a duty under its policy to defend Maglio, including posting the appellate bond.  First, Maglio contends that American Guarantee's policy required it to defend Maglio.  This argument is based on Charter Oak's decision to tender its full

---

[3] Charter Oak raised objections to the Settlement Agreement after it learned about it.  The Court need not decide at this point the validity of the Settlement Agreement, or the validity of Maglio's assignment of its claims to Leonetti's, but concludes that Maglio does have standing in this case because it has a financial interest in the outcome, based on the terms of the Settlement Agreement.

policy limits so that Maglio could negotiate a global settlement of all claims, including both the

Maglio and the Forte brand claims.  Ultimately, Charter Oak paid its limits into court, via an

equitable interpleader action.  Maglio contends that Charter Oak's payment was an admission of

coverage and also exhausted the Charter Oak policy limits, thus triggering American Guarantee's

duty to defend under the terms of the American Guarantee policy.

Although Maglio acknowledges Charter Oak continued to provide counsel to Maglio,

negating American Guarantee's obligation to do the same, Maglio argues that American

Guarantee remained obligated to cover other aspects of its defense, including the payment for the

appellate bond.  Testimony at trial was uncontradicted that Maglio would not have been able to

obtain an appellate supersedeas bond by merely paying a premium, because of its tenuous

financial condition.  Rather, the only way for Maglio to post a bond, unless American Guarantee

agreed to do so, would have been to post assets as security for the bond – assets that Maglio did

not have.

Maglio relies on the basic principle of Pennsylvania law which makes clear (1) that an

insurer must defend a claim against its insured, until and unless it is clear that there is no possible

coverage under the claim, and (2) that this duty to defend is broader than the duty to indemnify.[4]

Maglio contends that in the underlying litigation, both Charter Oak and American

Guarantee admitted coverage for the Forte brand verdict, and because Charter Oak subsequently

voluntarily tendered and paid its policy limits into court (which limits are larger than the Forte

brand verdict), Charter Oak has thereby tacitly admitted  coverage for the Maglio brand claim, as

well as the Forte brand claim, and therefore, that Charter Oak's payment of the policy limits into

---

[4] In one of the questions to counsel after the conclusion of evidence, the Court asked whether, under the circumstances of this case, American Guarantee's policy provisions, as applied by American Guarantee, had the effect of "conflating" the duty to defend and the duty to indemnify, contrary to Pennsylvania law.  Maglio has not accepted or advocated this theory of possible liability against American Guarantee, and therefore the Court will not address it.

court "triggered" American Guarantee's obligation to defend Maglio.  Maglio further contends that given the policy language and the circumstances, "defense" must include the cost of a supersedeas bond.

Maglio asserts that without the supersedeas bond being filed, it could not appeal the verdict, and thus it lost its ability to defend against the verdict and the judgment entered on the verdict.  Thus, the next best alternative was the settlement agreement with Leonetti's.

### B.  American Guarantee

American Guarantee has argued, relatively simply and consistently, that under the terms of its "follow form" policy, it had no duty to defend until Charter Oak, as the primary carrier, exhausted its policy limits via payment for a covered claim.  In other words, American Guarantee has maintained that its policy only provides that its excess insurance will come into play if there is coverage of the claim **and** if the payment for that claim exceeds $1 million. American Guarantee contends that the only covered claim was the Forte brand claim, which was a claim for $660,000, and that Charter Oak's payment of that claim therefore did not exhaust the policy limits.  American Guarantee characterizes the additional $440,000 that Charter Oak paid into court as a "voluntary payment."

American Guarantee also contends that it appropriately and adequately reviewed Maglio's requests for indemnification and payment of the appellate bond, and its refusal to do so was reasonable.

### III.  Legal Standard

Maglio has brought two separate claims in its Amended Cross-Claims against American Guarantee:  one for bad faith under the Pennsylvania statute, 42 P.S.A. § 8371; and the second for breach of contract via violation of the breach of the implied covenant of good faith and fair dealing

6

The Court will address these in turn.

**A.      Statutory Bad Faith**

Maglio brings a claim under a Pennsylvania statute, 42 P.S.A. § 8371 for bad faith in an insurance policy.  Maglio must prove this claim by clear and convincing evidence, which of course, is a higher standard than preponderance of the evidence.

Under Pennsylvania law, an insurance company must act with the utmost good faith and fair dealing toward its insured, and give the interests of its insured the same faithful consideration that it gives its own interests.  This heightened duty arises because of the special relationship between an insurer and its insured and the nature of the insurance contract.

An insurance company acts in bad faith if it:  (1) does not have a reasonable basis for what it does; and (2) knows or recklessly disregards its lack of a reasonable basis.  Put another way, bad faith occurs if an insurer knowingly or recklessly acts without a reasonable basis in handling an insured's claim.

"Recklessly" means wantonly, with indifference to consequences.  If a person makes a representation without knowing whether it is true or not, or makes it without regard to its truth or falsity or to its possible consequences, he may be found to have made the representation recklessly.

For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (i.e., good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith.  Terletsky v. Prudential Property & Cas. Ins. Co., 649 A.2d 680, 688 (1994).

An insurer does not act in bad faith by investigating and litigating legitimate issues of coverage.  Eley v. State Farm Ins. Co., 10-CV-5564, 2011 WL 294031, *3 (E.D. Pa. Jan. 31, 2011) (Baylson, J.) (quoting Simon Wrecking Co., Inc. v. AIU Ins. Co., 530 F. Supp. 2d 706,

717 (E.D. Pa. 2008) (Brody, J.) (quoting Hyde Athletic Indus., Inc. v. Continental Cas. Co., 969 F. Supp. 289, 307 (E.D. Pa. 1997)).

      In deciding whether or not an insurance company acted in bad faith toward its insured, a court must consider all of the company's actions, including its responses to communications from its insured, its investigation of the claim, and its handling of settlement negotiations.  If the insurer knowingly or recklessly acted without a reasonable basis, the insured is entitled to recover.  See Pa. Suggested Standard Jury Instructions §7.300.

### B.    Breach of Contract

      Maglio also brings a claim alleging that American Guarantee breached the implied covenant of good faith and fair dealing.  In order to succeed on its claim for a breach of the covenant of good faith and fair dealing, Maglio must prove three elements by clear and convincing evidence:  (1) the existence of a contract and the content of its essential terms; (2) that American Guarantee breached the implied covenant of good faith and fair dealing; and (3) resultant damages.

      In order to fulfill its obligation of good faith and fair dealing, an insurer need only "accord the interest of the insured the same faithful consideration it gave to its own interest" and evaluate the case honestly, intelligently, and objectively.  Keefe v. Prudential Prop. & Cas. Ins. Co., 203 F.3d 218, 227 (3d Cir. 2000).   "A complete catalog of the types of bad faith is impossible, but certain strains of bad faith include:  '... evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.'"  In re McElwee, 469 B.R. 566, 584 (Bankr. M.D. Pa. 2012) (quoting Stamerro v. Stamerro, 889 A.2d 1251, 1259 (Pa. Super. Ct. 2005) and Somers v. Somers, 613 A.2d 1211, 1213 (Pa. Super. Ct. 1992)); Restatement (Second) of Contracts § 205 cmt. d.

### C.  Analysis of Cases on Bad Faith Standard under Pennsylvania Law

Courts have struggled with the relationship between the statutory and common law bad faith standards and the question of whether negligence constitutes bad faith.  In a very thorough opinion,  Judge McLaughlin of this Court cited the Third Circuit's bad faith standard under Cowden v. Aetna, 134 A.2d 223 (Pa 1957) as including negligence, and concluded that "a contract claim for bad faith requires evidence that an insurer acted negligently or unreasonably … ."  DeWalt v. Ohio Cas. Ins. Co., 513 F. Supp. 2d 287, 296-97 (E.D. Pa. 2007).

The legislative history of the Pennsylvania statutory cause of action for bad faith suggests that Pennsylvania wanted to extend the bad faith protection that currently existed in common law contract law into the realm of tort.  The statute does not define the term "bad faith." Nevertheless, cases construing the term "bad faith" in that context have adopted the understanding of "bad faith" that was widely understood and accepted in the insurance contract realm.  For example, the Third Circuit construed the term according to the "peculiar and universally acknowledged meaning in the insurance context":  "For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (i.e., good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith."  Polselli v.Nationwide Mut. Fire Ins. Co., 23 F.3d 747, 751 (3d Cir. 1994) (quoting Black's Law Dictionary 139 (6th ed. 1990)); see also Clunie-Haskins v. State Farm Fire & Cas. Co., 855 F. Supp. 2d  380, 388 (E.D. Pa. 2012) (Schiller, J.) (considering claim for breach of good faith and fair dealing and noting that "[i]n the insurance context, 'bad faith' has a 'universally acknowledged meaning,'" and that "mere negligence or bad judgment is not bad faith" (quoting Rottmund v. Cont'l Assurance Co., 813 F. Supp. 1104, 1108-09 (E.D. Pa. 1992)); Gold v. State Farm Fire & Cas. Co., 880 F. Supp. 2d 587, 597 (E.D. Pa. 2012) (McLaughlin, J.) (discussing legislative history and discussing the

relationship between bad faith claims under common law and those under § 8371; Toy v. Metro. Life Ins. Co., 928 A.2d 186, 199 (Pa. 2007) ("It is evident that by this time, the term 'bad faith' as it concerned allegations made by an insured against his insurer, had acquired a particular meaning in the law.").

Precedential decisions of the Pennsylvania appellate courts and the Third Circuit may cause some confusion.  In this case, on the issue of a supersedeas bond, there is really no issue of "negligence" so that word does not compel one conclusion or another. This Court has relied on the totality of the evidence, subject to the applicable burden of proof, and precedential Pennsylvania law concerning insurance policy provisions.

Nevertheless, should there be value to any summary, this Court makes two comments. First, the causes of action clearly differ.  The statutory bad faith claim sounds primarily in tort law, because punitive damages are the only remedy and punitive damages are exclusively awarded, under common law, for tortious conduct.  See City of Philadelphia Office of Hous. & Cmty. Dev. v. Am. Fed'n of State Cnty. & Mun. Employees, Local Union No.1971, 876 A.2d 375, 376-77 (Pa. 2005) ("This Court has defined punitive damages as compensation awarded to punish a party for actions of such an outrageous nature as to demonstrate intentional, willful, wanton or reckless conduct." (internal quotation marks omitted)).  Tort law is based on conduct in relationship to societal norms, such as protection against improper conduct by one individual against another, who are not necessarily bound by a contractual relationship.

On the other hand, a cause of action based on breach of an implied duty of good faith arises out of the contractual relationship itself, and attention must be paid to the contractual language.

However, the legislative history of 42 P.S.A. § 8371 indicates that the conduct required to show "bad faith" does not differ under either cause of action.  The history suggests that the legislature noted the protection that already existed for certain objectionable conduct in contract law and sought to extend that same protection for similar conduct into the area of tort.  Further, substantial case law has required proof by clear and convincing evidence as the burden of proof.

### D.  Conclusion Regarding Maglio's Bad Faith Claims

For the reasons set forth below, this Court has found that Maglio has failed to prove, by the applicable standard of proof, clear and convincing evidence, that American Guarantee is liable for statutory bad faith, because its evidence does not show any conduct that meets the Pennsylvania legal standard for statutory bad faith, and certainly no conduct that would warrant punitive damages, under Pennsylvania law.

The Court's analysis of the common law bad faith claim, arising out of the contractual relationship, although requiring a more detailed analysis of the precise facts, which are indeed unique, leads to the same conclusion.

### E.     Overview of Pennsylvania Insurance Law

Due to the unusual circumstances of the present action, and the lack of controlling authority discussing similar circumstances, the Court provides a brief overview of case law that guides its discussion.

#### 1.  Pennsylvania Jurisprudence on Obligations of an Excess Carrier

The Third Circuit has observed that "a true excess or secondary policy is not 'triggered' or required to pay until the underlying primary coverage has been exhausted." Koppers Co., Inc. v. Aetna Cas. & Sur. Co., 98 F.3d 1440, 1445 (3d Cir. 1996).   Yet, as the Pennsylvania Superior Court noted in a recent opinion, "[n]o Pennsylvania appellate court has addressed when an exhaustion clause triggers an excess insurer's duty to defend." Lexington Ins. Co. v. Charter

Oak Fire Ins. Co., 81 A.3d 903, 909 (Pa. Super. Ct. 2013), reargument denied (Jan. 10, 2014) (emphasis added). The Superior Court concluded that, "[a]bsent binding precedent to the contrary, our analysis is limited to applying longstanding principles to the interpretation of insurance contracts." Id. at 910.[5]

In Lexington, the Superior Court considered when the excess carrier's duty to defend arose. The case, while not dispositive of the issues before this Court, provides some guidance on the duties of excess carriers. The Court's analysis turned on the language of the excess insurance policy, which it found to be clear and unambiguous, and which stated that the excess insurer would "have the right and duty to defend the [i]nsured … when the applicable limits of '[u]nderlying [i]nsurance' and '[o]ther [i]nsurance' have been exhausted by payment of judgments or settlements." Id. (alterations in original). The insured in Lexington argued that the excess insurer's duty to defend arose upon an agreement to settle for an amount in excess of the policy limits. The Court rejected that argument, and instead concluded that the policy language provided that the duty arose only upon actual payment of the insurance.

The Third Circuit reached a similar conclusion in Axis Specialty Ins. Co. v. Brickman Grp. Ltd., LLC, 458 F. App'x 220 (3d Cir. 2012). There, the policy provided that the excess insurer would have the duty to defend "when the limits of insurance of the underlying insurance have been exhausted by payment of damages." Id. at 226. The Court concluded that the

---

[5] In Gen. Acc. Ins. Co. v. Safety Nat. Cas. Corp., 825 F. Supp. 705 (E.D. Pa. 1993) (Padova, J.), the Court determined that an excess insurer was obligated to contribute, on a pro rata basis, toward the cost of defending the insured, where both insurers executed a settlement agreement with the insured to resolve their coverage disputes in which they agreed to tender the full amount of their policy limits. In reaching this finding, the Court observed "a growing number, if not a majority, of jurisdictions recognize that 'the respective obligations as between several insurers who have covered the same risk do not arise out of contract, but are based upon equitable principles … .'" Gen. Acc. Inc. Co., 825 F. Supp. at 707. General Accident involved circumstances different from the present case – for instance, there, the insurers all agreed to pay their policy limits as indemnification – nor is this Court aware of this holding being adopted by the Third Circuit or followed by other district courts.

insurer's duty did not arise until the primary insurer paid its policy limits towards the settlement of the underlying claims.

More recently, the Pennsylvania Superior Court again addressed the question of whether a claim triggered an excess carrier's duty to defend in Titeflex Corp. v. Nat'l Union Fire Ins. Co., 88 A.3d 970 (Pa. Super. Ct. 2014), reargument denied (May 8, 2014).  There, the Court considered whether the suit presented a true conflict of law between New York and Pennsylvania.  The Court rejected the insurer's attempts to rely on New York case law discussing allocation of liability among multiple insurers, because the insurer's argument missed the relevant question:  Should the injury in question be considered (1) a single occurrence under the policy, resulting in multiple injuries, the aggregate amount of which exhausted the primary policy, or (2) a series of stand-alone injuries, each constituting its own claim, which must be evaluated separately to determine whether it exhausted the primary policy?  The Court concluded that both Pennsylvania and New York law would view the injuries as resulting from a single occurrence – a gasoline spill – that exhausted the underlying policy and triggered the excess carrier's duty to defend.  Id. at 980.

For many years, the Pennsylvania Superior Court has made it clear that, where an insurer acts in bad faith by repeatedly denying all obligations to defend and indemnify, an insured can "properly negotiate a settlement in an amount that [is] fair and reasonable and according to terms calculated to protect and preserve the physical assets which were essential to its ability to continue doing business." Alfiero v. Berks Mut. Leasing Co., 500 A.2d 169, 172 (Pa. Super., 1985).  Thus, if this Court determined that American Guarantee acted in bad faith by its refusal to defend Maglio, American Guarantee can be held liable for damages.

Maglio identifies <u>Koppers</u>, 98 F.3d 1440, as the leading Third Circuit case on the issues before this Court.  <u>Koppers</u> provides some guidance on questions involving the relationship between primary and excess carriers, but it does not address the most relevant issues.

In <u>Koppers</u>, the insured reached settlements with its primary carriers before trial, in an amount below the policy limits.[6]  At trial, the jury awarded approximately $70 million in damages and found that both the primary and excess policies covered the damages.  <u>Id.</u> at 1444.  The Third Circuit upheld the jury's finding that both the primary and excess insurance policies covered the damages, and the parties agreed that that the damages exceeded the primary policy limits.  Thus, the Court was concerned only with assessing the amount of indemnity owed by the excess carriers, not with whether or when that duty to indemnify arose.  Moreover, the Court did not consider the excess carriers' duty to defend at all, let alone when any such duty may have arisen during the course of the litigation.

The Third Circuit held that the settlements had functionally triggered the excess policies, and that the insured "may recover on the excess policy for a <u>proven</u> loss to the extent it exceeds the primary policy's limits."  <u>Id.</u> (emphasis added).  However, it allowed the excess carriers to set off the amount that they owed by the full amount of the primary policy limits, despite the fact that the insured recovered less than that amount in its settlement with the primary carriers.  The Court reasoned that an excess carrier cannot be held liable for unpaid amounts within the primary limits simply because the insured and the primary carrier agreed to forego them.

The circumstances of <u>Koppers</u> are easily distinguished here.  Most importantly, it did not involve claims of bad faith or questions of the scope of an insurer's duty to defend.  Moreover, in <u>Koppers</u>, the primary carrier paid less than its policy limits where the covered damages exceeded

---

[6] It is not clear from the opinion whether or not the primary insurers acknowledged liability in the settlement.

the policy limits.  Here, Charter Oak paid its policy limits, $440,000 in excess of the damages for the only potentially covered claim, the Forte brand claim.

It is difficult to imagine a court imposing a duty to indemnify, let alone defend, upon an excess carrier for damages that do not reach the primary policy limit, notwithstanding a settlement agreement between the insured and the primary insurer.  This is the principle Maglio seeks to read into Koppers.  Under Maglio's reading of Koppers, suggested in its Post-Trial Memorandum, American Guarantee's duty to defend would be triggered in the event that Charter Oak had paid Maglio $500,000, because Maglio contends that such payment would operate as a functional exhaustion of Charter Oak's obligations.  ECF 225 at 3 (characterizing Koppers as holding that "[a] payment made by the primary carrier in settlement may constitute exhaustion even if it is not the full primary limits").  While Koppers does reach such a result, that result also shows why the reasoning in Koppers must be limited to its circumstances and cannot apply here, to this insurance policy.  The Court's rationale only makes sense when determining the amount of an excess carrier's indemnity obligation following a finding that the excess policy covered the damages and that those damages exceeded the primary policy limits.  Such circumstances do not exist here.

Other cases discuss and apply Pennsylvania law in somewhat similar but nevertheless distinguishable circumstances.  For example, a number of cases discuss the situation where a primary carrier becomes insolvent, thus requiring the excess carrier to "drop down" and act as the primary insurer.  See, e.g., Gen. Refractories Co. v. Allstate Ins. Co., No. CIV. A. 89-7924, 1994 WL 246375 (E.D. Pa. June 8, 1994).  In this case, however, there is no dispute that Charter Oak made available its full policy limits and that American Guarantee acted solely as an excess carrier to Maglio.

Further, very few cases explore whether an insurer has a duty to pay for an appellate bond.  In Zahler v. DeSantis, No. 4326, 1980 WL 194170 (Pa. Com. Pl. Apr. 10, 1980), the Court cited a number of cases in support of the following proposition:

> the duty to file a supersedeas bond was inherent in the fiduciary relationship between an insurer and its insured arising out of provisions of the policy vesting in the insurer both exclusive control of the litigation and a duty to defend, and from the carrier's conduct pursuant thereto.

Id.  However, the Zahler opinion discusses this duty to post an appellate bond as arising only after a court has already found that an insurer acted in bad faith by refusing an offer of settlement within policy limits.  The Zahler opinion suggests that, just as an insurer can be held liable for amounts in excess of the policy limit if it refuses to settle within the policy limits, it can also be required to post an appellate bond.  Finally, in Koppers, 98 F.3d 1440, the Court observed that, where an insured reaches a settlement with its primary insurer, the primary insurance is functionally "exhausted," but the insured forfeits any right to coverage of any settlement amount in excess of the primary policy's limits, because the excess carrier "never agreed to pay for losses below a specified floor."  Id. at 1444.  In the present suit, there is no that Maglio let Charter Oak "off the hook."

In its Post-Trial Memorandum, American Guarantee cited a number of cases discussing policies where the duty to defend and the duty to indemnify were coterminous.

For example, in State Farm Fire & Cas. Co. v. Cooper, CIV.A. 00-5538, 2001 WL 1287574 (E.D. Pa. Oct. 24, 2001), Judge Reed considered a motion for summary judgment.  The language of the policy at issue there was very similar to that of American Guarantee's policy.  There, the policy provided that "[i]f a claim is made or a suit is brought against an insured for damages because of bodily injury or property damage to which this coverage applies … [insurer]

16

will … provide a defense."  <u>Id.</u> at *2.  Judge Reed observed, as this Court does here, that this language renders the duty to defend "coterminous" with its duty to indemnify.  <u>Id.</u> at *3.

<u>Cooper</u>'s analysis therefore moved on to the duty to indemnify.  The Court observed that the "determination of the duty to indemnify is not limited to the facial allegations of the underlying complaint" and that the insurer "may rely upon evidence outside the underlying complaint to prove that it has no duty to indemnify the underlying claim."  <u>Id.</u> at *4.  Moreover, the Court observed that it, too, could "look outside the four corners of the … complaint."  <u>Id.</u>

However, in <u>Cooper</u>, the claimant pled guilty to charges that conclusively established that he acted intentionally and, therefore that the insurance policy, which had an exclusion for intentional conduct, did not cover the resultant damages from his actions.  Thus, the opinion may not be as relevant as it appears as first glance, because the question of indemnification had been determined conclusively.  The opinion finds only that a conclusive determination that extinguished the duty to indemnify also extinguished the duty to defend, based on the policy's language.

<u>Northland Ins. Co. v. Stranieri</u>, 3:06-CV-1809, 2008 WL 2944614 (M.D. Pa. July 28, 2008), also cited by American Guarantee, stands for the same proposition:  that an insurer cannot be bound to defend if it is not bound to indemnify; thus, an insurer can terminate its representation of its insured in the middle of litigation if it confines any potential recovery to uncovered claims.

## 2.  The <u>Babcock</u> Decision

In previous Memoranda, this Court has relied heavily on the Pennsylvania Superior Court's decision in <u>Babcock & Wilcox Co. v. Am. Nuclear Insurers</u>, 76 A.3d 1 (Pa. Super. Ct. 2013), <u>appeal granted in part,</u> 84 A.3d 699 (Pa. 2014).  This decision has less relevance to the resolution of this lawsuit, in light of the fact that Maglio and Charter Oak have reached a

settlement.  However, the Court cites it here only to make clear that insurers such as Charter Oak are well within their rights to take over the defense of an insured while also reserving their rights to later contest coverage.  Id. at 13.  Relatedly, an insurer can agree to tender funds to enable its insured to reach a settlement of claims against it, while continuing to reserve its rights to contest coverage at a later point in time.  In other words, Charter Oak's decision to tender its policy limit to reach a global settlement of all claims cannot be read as an undoing of its previous reservation of rights, or as an admission of coverage.

**IV. The Trial**

Although the parties did not dispute the facts material to the resolution of this dispute, the Court nevertheless denied the cross-motions for summary judgment and held a brief bench trial. It did so because Maglio contended that American Guarantee did not act reasonably in reviewing the relevant information before reaching its decision to disclaim indemnity and its refusal to post the appellate bond.  The Court scheduled a trial to give Maglio the opportunity to produce evidence on these issues; cross-examine American Guarantee's witnesses; present its own witnesses, including its expert witness; and otherwise build a full trial record.  The Court also took note of the lack of appellate guidance on the relevant issues and believed that the parties and the Third Circuit would benefit from a full trial record should an appeal be taken.

Following this Court's factual findings – some of which were issued orally, in court, on August 1, 2014 and some of which were issued in a Memorandum, filed one week later, ECF 212 – and in light of the fact that Maglio has the burden of proof, the issue to be resolved by this Court is whether Maglio can show that Pennsylvania law supports its theory of liability.

To address that issue, the Court first turns to the relevant provisions of American Guarantee's policy.

**V.  American Guarantee's Policy Provisions**

    **A.  Contractual Language**

American Guarantee's insurance policy (the "Policy") provides two types of coverage to

Maglio:  Coverage A and Coverage B.  M. Ex. 56 (American Guarantee Policy) at 1.  In broad

terms, Coverage A provides excess, follow-form coverage, meaning that it provides coverage

where the primary insurance policy so provides, although it does so in excess of the primary

policy's limits.  Coverage B provides umbrella liability insurance, or insurance in certain

circumstances and only where the primary insurance provides no coverage.

Section III of the Policy is titled "Defense and Supplementary Payments."  Id. at 3.

Section A provides:

> We have the right and duty to assume control of the investigation
> and settlement of any claim, or defense of any suit against the
> insured for damages covered by this policy … [u]nder Coverage A,
> when the applicable limit of underlying insurance has been
> exhausted by payment of claims for which coverage is afforded
> under this policy … .

Id.  Section B states:

> In those circumstances where paragraph A. above applies, in
> addition to the applicable Limits of Insurance, we will pay our
> expenses and the following to the extent that they are not included
> in underlying insurance: … [¶] 2. The cost of bonds to release
> attachments, but only for bond amounts within the amount of
> insurance available.

Id.

    **B.  "Payment"**

American Guarantee contends that Charter Oak did not make "payment" of its policy

limits until the state court released the funds that Charter Oak paid into escrow, which took place

on July 16, 2012.  At that time, Maglio and Leonetti's had already settled the underlying claims.

American Guarantee therefore argues that it had no duty to defend, since there were no claims in dispute when its duty arose.

Maglio argues, instead, that Charter Oak made payment on the date in which it paid the funds into court:  March 8, 2012.  American Guarantee contests this position, arguing that payment into court did not constitute a "payment of claims."

The Court agrees with Maglio that the payment into court on March 8, 2012 constituted payment under the policy.[7]  This definition makes the most sense since Charter Oak relinquished its claim to the money and agreed that it would eventually be paid over to either Leonetti's or Maglio.

### C.  "Cost of Bonds"

The Policy provides for the payment of "cost" of a bond.  The parties do not dispute that this provision would apply to appellate bonds; however, it remains unclear what the Policy means by the "cost" of a bond.  The Court interprets that term to include whatever amount would be necessary to secure a bond.  For a financially viable company, for which a surety would most likely issue an appeal bond based on payment of a premium, the "cost" of the bond would be the premium, and the insured would be responsible to pay the judgment if the appeal was unsuccessful and there was no coverage of the claim.  However, as the Court must interpret this language against American Guarantee, the drafter of the Policy, the Court concludes that, for a financially weak company like Maglio, the "cost" of the bond would include, assuming the other requisites of the insurance policy were met, the full amount of the supersedeas bond necessary for Maglio to take an appeal.

---

[7] The Court need not address whether Charter Oak's tender of the policy limit, on December 22, would constitute "payment" under the Policy.  Because Charter Oak continued to provide counsel to Maglio throughout the underlying litigation, the only action American Guarantee would have had to take to defend Maglio – the posting of the appellate bond – did not arise until May 2012, long after the tender and the payment.

The Court notes that although Charter Oak was willing to provide counsel – Edward
Kelbon and John Hare – to represent Maglio through the appeals process and that it permitted its
policy limits to be used for a bond, Charter Oak capped any such contribution for a bond at its
policy limits of $1 million, which was insufficient in view of the total amount of both verdicts,
which totaled slightly over $3 million.  Thus, Charter Oak had no further obligation to post a
bond.

## VI.   Reasonableness of American Guarantee's Conduct Until Denial of Post-Trial Motions

Before resolving the question of whether American Guarantee acted in bad faith by not
taking up the defense of Maglio by paying the cost of the appellate bond, the Court will address
Maglio's arguments that American Guarantee acted in bad faith following Charter Oak's
decision to tender its policy limit.

### A.  December 22 Tender

As an initial matter, the Court acknowledges the validity of Charter Oak's decision to
tender its full policy limits to Maglio on December 22, 2011, just before the jury returned the
Forte brand verdict.  The record evidence makes clear that Charter Oak tendered the policy limits
to achieve a global settlement of all claims, but never admitted any duty to indemnify Maglio for
the Maglio brand verdict.

As discussed in more detail in the Factual Findings of Fact (ECF 212, pp. 5-9), Charter
Oak took the position that its tender was the result of its consideration of Maglio's request that
Charter Oak tender its limits.

Charter Oak continued to provide a defense to Maglio and represented that it would
continue to do so throughout the appellate stage of litigation.  The Court finds nothing
unreasonable or inappropriate about Charter Oak's decision to tender its policy limit at this time,

nor does it find any need to fashion the word "tender" as a legal term of art for purposes of resolving this dispute.

Moreover, <u>Babcock</u> refutes Maglio's claim that Charter Oak's decision to tender its policy limits amounts to an acknowledgement of coverage of all claims, including the Maglio brand claim.  Rather, Pennsylvania law is clear that "[w]here the insurer assumes the duty to defend, the insurer can simultaneously challenge whether the claim is covered under the insurance policy, even if the underlying case settles."  <u>Babcock</u>, 76 A.3d at 12 (quoting <u>Step Plan Servs., Inc. v. Koresko</u>, 12 A.3d 401, 419 (Pa. Super. Ct. 2010)).  The same reasoning applies to Charter Oak's tender as a settlement of Maglio's claims for coverage, without necessarily admitting coverage.  Charter Oak had a legitimate reason to tender so as to avoid any responsibility for an excess verdict on a retrial of either or both claims.[8]

### B.  American Guarantee's Conduct Prior to Denial of Post-Trial Motions

American Guarantee initially disclaimed coverage for the Maglio brand verdict on December 2, 2012.  In support of its position, American Guarantee relied on its review of Maglio's counsel's communications and reports, the pleadings in the underlying litigation, and Charter Oak's disclaimer letters.  As the Court's findings of fact concluded, American Guarantee conducted a reasonable investigation of Maglio's claim for coverage of the Maglio brand verdict, and reasonably relied on the position of Charter Oak, before issuing its December 2, 2012 disclaimer.

Charter Oak's decision to tender its full policy limits on December 22 did not affect American Guarantee's position or obligations.  As stated above, Charter Oak continued to assert that its policy did not cover the Maglio brand verdict.  Moreover, Charter Oak agreed to continue

---

[8] Under Pennsylvania insurance law, an insurer may be liable for a verdict in excess of policy limits if it unreasonably refuses to settle within policy limits.  <u>Hough v. Allstate Insurance Company</u>, 372 F.3d 277 (3d Cir. 2003).

to provide counsel to Maglio throughout the appellate stage of the litigation, should an appeal be taken.

The findings of fact further show that American Guarantee continued to act reasonably after the jury returned the Forte brand verdict against Maglio.  Although Charter Oak acknowledged that its policy covered the Forte brand verdict, American Guarantee still had no duty to defend, because that verdict did not reach the policy limits and Charter Oak continued to provide counsel to Maglio.

As Maglio's options began to run out, American Guarantee maintained its limited involvement but did not act in bad faith.  American Guarantee clearly and justifiably relied on Charter Oak's denial of coverage of the Maglio brand verdict and its commitment to continue to defend Maglio.  Moreover, American Guarantee hired coverage counsel to closely monitor events of the underlying action and to provide advice as to American Guarantee's duty to Maglio.  The record shows that Mr. Christie and his colleague, Rex Brien, communicated frequently with representatives of Maglio and Charter Oak and that American Guarantee continued to be watchful of its duty to Maglio.

Maglio has not brought forth evidence that American Guarantee's conduct lacked a reasonable basis.  American Guarantee's vigilance, coupled with Charter Oak's continued defense of Maglio, relieved American Guarantee of the duty to take any action in defense of Maglio.  Even if Maglio were correct that American Guarantee incorrectly evaluated coverage of the Maglio brand claim, the evidence fails to show that American Guarantee did so out of self-interest or ill will.  Absent such a showing, Maglio's bad faith claim falls short.  Throughout this time period, the Court cannot find that Maglio has proven that American Guarantee acted in bad faith.

### VII.     Obligation to Post Bond Following Denial of Post-Trial Motions

Determining the duty owed by American Guarantee to Maglio following the trial court's denial of Maglio's post-trial motions is a more complicated inquiry.  After a close examination of the relevant facts, however, the Court finds that American Guarantee cannot be liable for bad faith under the applicable standard of proof:  clear and convincing evidence.

### A.  Characterization of the Duty to Post a Bond

As an initial matter, the Court notes that the parties dispute whether American Guarantee's duty to post an appellate bond is generally part of its duty to defend or its duty to indemnify.  The Court is unaware of controlling authority on this question and the parties have not cited any.  On one hand, it makes sense to conceptualize this duty as part of the duty to defend, since it is inextricably tied to an insured's desire to continue to contest the claims against it.  On the other hand, the practical effect of the provision, in the event of an unsuccessful appeal, will be that the insurer is required to functionally indemnify the insured by forfeiting the bond for the trial judgment.  Requiring insurers to assume a broader duty to defend on this topic, then, may result in an insurer having to indemnify an insured for a claim that the policy does not cover, in contradiction of the policy language here.

Debating whether this "cost" of bond provision is part of the defense or indemnity duty is not easily or necessarily answerable.  The term is a "hybrid" as applied to this unique case.

### B.  Interpretation of Section III

Neither party has offered any precedent addressing an excess carrier's duty to post an appellate bond.  Absent controlling law, this Court must apply fundamental contract principles to interpret American Guarantee's duties under the terms of the Policy.  To do so, the Court looks to the language of Section III, the Policy's provision concerning American Guarantee's duty to defend.

The Policy is structured so that American Guarantee only becomes obligated to incur the cost of bonds if Charter Oak's policy limit "has been exhausted by payment of claims for which coverage is afforded under this policy."  M. Ex. 56 at 3.  In other words, American Guarantee has no duty to defend Maglio, or pay for an appellate bond, unless Charter Oak paid $1 million for a covered claim.

### C.  Application to Facts

As the testimony  at trial disclosed, American Guarantee now agrees with Maglio that it and Charter Oak admitted coverage for the Forte brand verdict – a conclusion with which this Court disagreed in its October 24, 2013 Memorandum and Order.[9]  However, the Forte brand verdict was only for $660,000, and did not reach the Charter Oak policy limits.  Thus, while Charter Oak did make payment for "[a] claim[ ] for which coverage [was] afforded," that payment did not exhaust its policy limits.  The discussion above rejected Maglio's argument that the Charter Oak payment of its limits also admitted or acknowledged coverage of the Maglio brand verdict.

Assuming Maglio is correct that the payment of the Charter Oak policy limits "exhausted" its policy, the payment was only in part for a "covered" claim.  Thus, the Court *cannot conclude, as required by § III(A) of the American Guarantee policy that the primary* insurance was "exhausted by payment of claims for which coverage is afforded…."

Given that the Charter Oak payment did not trigger American Guarantee's duty to defend, and therefore, its duty to post an appellate bond, the Court finds that American Guarantee did not act in bad faith by refusing to post such bond.

---

[9] One reason for this seeming contradiction is, with the court's perhaps imperfect recollection, that the evidence introduced at trial (as to the Forte brand verdict), was not part of the record of the coverage dispute.

The Court finally notes that this lawsuit presents questions of unsettled law.  Thus, it is all the more difficult for Maglio to show that American Guarantee acted in bad faith, when "an insurer's denial of a claim does not constitute bad faith if it is based on a reasonable legal position in an unsettled area of the law." Nw. Mut. Life Ins. Co. v. Babayan, 430 F.3d 121, 137 (3d Cir. 2005) (citing Terletsky v. Prudential Prop. & Cas. Ins. Co., 649 A.2d 680, 690 (Pa. Super. Ct. 1994)).

## VIII.   Conclusion

For the reasons states above, this Court finds that Maglio has failed to show, by clear and convincing evidence, that American Guarantee acted in bad faith in violation of 42 P.S.A. § 8371 or in breach of the covenant of good faith and fair dealing.

An appropriate Verdict and Judgment follows.

O:\CIVIL 12\12-3967 Charter Oak v. maglio\12cv3967.090814.memo.conclusions.verdict.docx